IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHER-D, INC., T/A PINE KNOB INN    :
            :              CIVIL ACTION
        v.            :
            :              NO. 05-5936
GREAT AMERICAN ALLIANCE    :
INSURANCE COMPANY         :

**SURRICK, J.**                                    **APRIL  7 , 2009**

## <u>MEMORANDUM & ORDER</u>

Presently before the Court is Defendant's Motion for Summary Judgment (Doc. No. 12).

For the following reasons, the Motion will be granted in part and denied in part.

## I.    BACKGROUND

This is an insurance coverage dispute that arose between an insured, Pine Knob Inn, and

its insurer, Great American Alliance Insurance Company, following two fires.  Pine Knob Inn

("Plaintiff") was a 28-room country inn located on nearly seven acres of land in Canadensis, a

town in the Poconos region of northeastern Pennsylvania.  (Doc. No. 12 ¶ 1; Doc. No. 17 ¶ 1.)

Plaintiff served guests with food and lodging in the Poconos for over 100 years.  (Compl. ¶¶ 1-2;

Def.'s Ans. ¶¶ 1-2.)  Plaintiff's property included two cottages, a bungalow, a conference center,

a pool house, and a main building that contained 19 rooms.  (J. Garman Dep. at 22.)  On January

22, 2004, Plaintiff purchased an Innkeeper's Insurance Policy ("the Policy") from Great

American Alliance Insurance Company ("Defendant"), which provided coverage for Plaintiff's

main building.  (*See* Doc. No. 14, Ex. A.)  The Policy had a policy period of March 12, 2004 to

March 12, 2005.  (*See id.*; *see also* Doc. No. 12 ¶ 9; Doc. No. 17 ¶ 9.)  The Policy contained two

provisions that are relevant to this dispute.  The first provision, entitled "Commercial Property

Conditions," provided the following:

POLICY PERIOD, COVERAGE TERRITORY

Under this Coverage Part:

1.    We cover loss or damage *commencing*:

a.    During the policy period shown in the Declarations.
. . .

(Doc. No. 14 at 6 (emphasis added)).  The second provision, entitled "Innkeepers Property

Coverage Form," provided the following:

COVERAGE

We will pay for *direct physical loss* of or damage to Covered Property at the
premises described in the Declarations caused by or *resulting from* any
Covered Cause of Loss.

(*Id.* at 8 (emphasis added)).  A "Covered Cause of Loss" is defined as a "risk of direct physical

loss." (*Id.* at 10.)

On October 1, 2004, while the Policy was in place, there was an electrical fire in

Plaintiff's main building due to faulty wiring.  (Doc. No. 12 ¶ 5; Doc. No. 17 ¶ 5.)  The fire was

extinguished on the same day.  (*Id.*)  Plaintiff ceased operations because of the fire and intended

to repair the damage.  (Doc. No. 12 ¶ 6; Doc. No. 17 ¶ 6; C. Garman Dep. at 24-25.)  Plaintiff

submitted a claim under the Policy immediately after the fire.  (Doc. No. 12 ¶ 8; Doc. No. 17 ¶ 8;

Doc. No. 17 at 4.)  Defendant agreed that the Policy covered Plaintiff's claim.  (Doc. No. 17 at

4.)  Plaintiff hired a public adjuster, Clark Jones ("Jones"), to serve as its representative in

connection with the claim.  (C. Garman Dep. at 8.)  Within two weeks of the fire, Defendant sent

its contractor, Belfor Construction Company ("Belfor"), to "shore up the lobby floor" so that

Defendant's investigators could enter the main building.  (*Id.* at 14.)  During that visit, Belfor

told Plaintiff that it "would not be a problem to rebuild this building." (*Id.* at 13.)

2

The next month, in November 2004, Plaintiff told Defendant's representative Don Jordan ("Jordan") that Plaintiff "intended to rebuild and recommence the business."  (*Id.* at 25; J. Garman Dep. at 56.)  Jordan told Plaintiff that it would "be no problem to rebuild the property" and that it would "be very doable."  (J. Garman Dep. at 56.)  Plaintiff understood that Defendant was handling the rebuilding process and so Plaintiff did not take steps to initiate the rebuilding. (*Id.*)  Plaintiff "got the impression" that Defendant was handling the rebuilding based on Defendant's statements:

> Q:    Is that why you didn't do anything, because you thought it was being handled by Belfor?
> A:    I thought that it was being handled, yes.
> Q:    And you got that impression from where?
> A:    Well, from Don Jordan.  And the Belfor people were there.  But I don't know how much – I mean, from day one, they said, We can do this.  We can take care of this problem.  You know, we will solve this problem for you.

(*Id.* at 64.)  Plaintiff did not ask Defendant "when they were going to start" with the rebuilding, because Plaintiff had never been involved in this type of an insurance claim and "just figured it was the protocol of the insurance company":

> Being the novices that we were, and thank God, we had never been involved in anything like this before, I just figured it was the protocol of the insurance company. I didn't think as owners we had the ability to ask or demand anything other than what was being done.

(C. Garman Dep. at 16.)  Plaintiff was also "under the assumption that [it] couldn't do anything on [its] own," since Plaintiff "was under the assumption that it was [Defendant and] Belfor doing the construction."  (*Id.* at 28.)  Even if Plaintiff wanted to begin rebuilding on its own, Plaintiff could not have done so since Defendant had given them "no money."  (J. Garman Dep. at 58.)

On December 7, 2004, Plaintiff provided Defendant with an inventory of the building contents.  (*See* Doc. No. 17, Ex. G.)  A month later, on January 3, 2005, Plaintiff presented

Defendant with a formal estimate to repair the building in the amount of $1,258,745.11.  (Doc.

No. 17, Ex. F.)  Starting sometime that month, with the rebuilding process not yet begun,

trespassers entered Plaintiff's building and began to engage in acts of vandalism.  (C. Garman

Dep. at 28-29.)  The vandals were "breaking in daily" and, since there was no electricity, "[t]hey

were lighting candles" and "sleeping on old mattresses."  (*Id.*; *see also* Doc. No. 17 at 6.)

Plaintiff took steps to prevent the vandals from entering the building.  The windows and

entrances were "boarded up with plywood" and "with two by fours."  (J. Garman Dep. at 74.)

Plaintiff "tried to close [the main building] up as much as possible" by securing the access

points.  (*Id.*)  However, the building was "very large" and had "a lot of access points."  (*Id.*)  The

vandals "kept moving" and when one entry point was secured, "they'd just go to another part."

(*Id.*)  Plaintiff notified the police about the incidents of vandalism, and the police began to patrol

the area "on a regular basis."  (*Id.* at 74, 80.)  Plaintiff, meanwhile, continued to secure the

access points.  Plaintiff believed that Jones had told Defendant about the vandalism at some

point prior to May 2005 so that Defendant was made "aware of the situation."  (C. Garman Dep.

at 29.)  There is no evidence in the record of vandalism occurring at any time before the first fire

except for "an incident where somebody got into the basement and stole some drinks or liquor."

(Scalice Dep. at 70.)

    In late January 2005, Defendant notified Plaintiff that it would not renew Plaintiff's

insurance policy.  (Doc. No. 17 at 6.)  Plaintiff therefore attempted to purchase insurance from a

broker, James Wolf Insurance.  (J. Garman Dep. at 84.)  The broker was unable to obtain a

policy to insure the main building.  (*Id.*)  In late January or early February 2005, Plaintiff

attempted to purchase insurance through another broker, Richard Scalice.  (Scalice Dep. at 26.)

Scalice told Plaintiff that it was going to be "difficult if not impossible" to get insurance on the main building "because it's a burnt out structure." (*Id.* at 28-29.) Scalice attempted to secure an insurance policy, but to no avail:

> You know, whether you want to raise your hand with lots of cash on the street corner and wave it doesn't matter if nobody wants to take your money. It doesn't matter how much money you have in your fist; if nobody wants it, nobody wants it. But I did try, nonetheless, to get insurance on the main building.

(*Id.* at 28.) Scalice spoke with several potential insurers but ultimately could not obtain a policy for Plaintiff. (*Id.* at 32.) On March 12, 2005, Plaintiff's insurance policy with Defendant expired leaving Plaintiff with no insurance on the property. (*See* Doc. No. 14, Ex. A.)

In Spring 2005, Jones complained to Defendant that it was taking too long for Defendant to settle Plaintiff's claim. (Jones Dep. at 45-46; J. Garman Dep. at 46.) Jones did not have "an actual cash value figure" from Defendant, but Jones "knew what [Defendant's] estimate was." (Jones Dep. at 48.) Jones asked Defendant, "why don't you just pay it," or "words to that effect." (*Id.* at 46.) Jones does not recall what Defendant said in response. (*Id.*) At some point in May 2005, Jones told Jordan about the ongoing vandalism. (C. Garman Dep. at 29.) Plaintiff believed that Jones had already made Defendant aware of the vandalism at some prior time. (*Id.*)

On May 5, 2005, Defendant visited the main building to inspect the contents. (*See* Doc. No. 17, Ex. H.) After the inspection, Jones again demanded the insurance proceeds from Defendant. Jones testified that he told Defendant, "if you can't give me a number, just give me what you think you owe us and we'll go to appraisal. . . . Whatever I have to do, we'll do it because we need to get this thing done." (Jones Dep. at 54.) Jones asked Defendant to "pay the amount of the building loss that Plaintiff had calculated," but Defendant "slow[ed] everything up." (*Id.* at 55.) Jones then called a former colleague who used to work for Defendant to find

5

out how to "go over [Jordan's superior's] head . . . to get this thing done." (*Id.* at 56.)

On May 23, 2005, the main building sustained a second fire. (Doc. No. 12 ¶ 11; Doc. No. 17 ¶ 11.)  The second fire caused damage to the main building in addition to the damage that was caused by the first fire. (*Id.*)  The building was "completely destroyed" after the second fire. (Doc. No. 17, Ex. B.)  Whereas the first fire was caused by faulty wiring, Plaintiff concluded that the second fire was caused by vandalism since there was no electricity in the building.[1] (C. Garman Dep. at 28.)  On June 17, 2005, Plaintiff made a claim under the Policy for the damage caused by the second fire. (Doc. No. 12 ¶ 14; Doc. No. 17 ¶ 14.)  Plaintiff contended that the second fire was resulting damage from the first fire in October 2004, and therefore was a loss covered under the Policy, which had expired. (Doc. No. 12 ¶ 15; Doc. No. 17 ¶ 15.) Plaintiff estimated that it was entitled to an additional $2,741,255.00 from Defendant. (Doc. No. 14, Ex. B.)

On July 18, 2005, Defendant provided Plaintiff with its estimate of the damages from the first fire that had occurred in October 2004. (*See* Doc. No. 17, Ex. J.)  Defendant estimated that the repairs from the first fire would be $1,073,919.85, at replacement cost. (*Id.*)  Defendant applied a 15% depreciation factor and arrived "at an actual cash value loss of $991,382.61." (*Id.*)  Defendant's estimate of the cost of repairs was approximately $250,000.00 less than Plaintiff's estimate. (*See* Doc. No. 17, Ex. F.)

On September 1, 2005, Defendant denied Plaintiff's claim for coverage under the Policy for the second fire. (Doc. No. 12 ¶ 16; Doc. No. 17 ¶ 16.)  Defendant reasoned that "the second

---

[1] For purposes of this Motion, Defendant "concedes that the May 2005 fire was started by vandals." (Doc. No. 13 at 3 n.1.)

fire was not a covered loss because it did not occur within the . . . policy period and the second

fire is not the same 'occurrence' as the first fire."  (*Id.*; *see also* Doc. No. 14, Ex. C.)

## II.    PROCEDURAL HISTORY

On November 1, 2005, Plaintiff filed a two-count Complaint in the Court of Common

Pleas of Monroe County.  (*See* Doc. No. 1.)  Count I alleges that Defendant breached its contract

with Plaintiff to provide insurance coverage under the Policy.  (*See* Compl. ¶¶ 20-24.)  Count II

alleges that Defendant acted in bad faith under Pennsylvania law, 42 Pa. Cons. Stat. Ann. §

8371, "and other applicable law" by declining coverage to Plaintiff.  (*See* Compl. ¶¶ 25-28.)

Defendant removed the case to this Court pursuant to 28 U.S.C. § 1332.[2]  (*See* Doc. No. 1.)

Defendant filed the instant Motion for Summary Judgment, which is now ripe for disposition.

(*See* Doc. Nos. 12-13.)

## III.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine

issue of material fact exists only when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of demonstrating that there are

no facts supporting the nonmoving party's legal position.  *Celotex Corp. v. Catrett*, 477 U.S.

317, 322-24 (1986).  Once the moving party carries this initial burden, the nonmoving party must

---

[2] We agree with the parties that diversity jurisdiction is proper.  The parties are citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.  *See* 28 U.S.C. § 1332.

set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The nonmoving party "cannot 'rely merely upon bare assertions, conclusory allegations or suspicions' to support its claim."  *Fin. Software Sys., Inc., v. Lecocq*, No. 07-3034, 2008 WL 2221903, at *2 (E.D. Pa. May 29, 2008) (*quoting Fireman's Ins. Co. v. DeFresne*, 676 F.2d 965, 969 (3d Cir. 1982)).  Rather, the party opposing summary judgment must go beyond the pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324.  When deciding a motion for summary judgment, we must view facts and inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).  However, we must not resolve factual disputes or make credibility determinations.  *Siegel Transfer*, 54 F.3d at 1127.

## IV.   DISCUSSION

### A.   Plaintiff's Breach of Contract Claim (Count I)

Defendant contends that "only loss or damage that commences during the policy period is covered" under the Policy.  (Doc. No. 13 at 5.)  Defendant argues that the damage caused by the second fire on May 23, 2005 "is not loss or damage that commenced during the policy period," and thus the damage is not covered, entitling Defendant to summary judgment.  (*Id.* at 6.) Plaintiff maintains that the damage caused by the second fire "is resulting damage from the October 2004 loss" and therefore falls under the Policy.  (Doc. No. 17 at 9.)  Plaintiff argues that it had a "reasonable expectation . . . that [it] was covered for any damage to the building as a

result of the October 2004 fire," and the second fire "would never have occurred . . . but for the

first fire."  (*Id.*)  Plaintiff reasons that "[w]hen weather, mold, and further collapse cause

additional damage to a fire damaged structure, the insurer is responsible to pay for such

additional loss not because it is a new claim but because it falls under the doctrine of progressive

loss and the resulting damage provisions of the policy."  (Doc. No. 17 at 10.)  Plaintiff's

argument is one of "but for" causation.  (*See id.* at 12 ("What is at issue is whether the fact finder

will decide whether the second fire would not have occurred but for the first fire.")).

 "The interpretation of an insurance contract regarding the existence or non-existence of

coverage is 'generally performed by the court.'"  *Minn. Fire & Cas. Co. v. Greenfield*, 855 A.2d

854, 861 (Pa. 2004) (*quoting Gen. Acc. Ins. Co. of Am. v. Allen*, 692 A.2d 1089, 1093 (Pa.

1997)).  A court's "purpose in interpreting insurance contracts is to ascertain the intent of the

parties as manifested by the terms used in the written insurance policy."  *Donegal Mut. Ins. Co.*

*v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007) (*citing 401 Fourth Street, Inc., v. Investors Ins.*

*Group*, 879 A.2d 166, 171 (Pa. 2005)).  "[W]hen a provision in the policy is ambiguous, the

policy is to be construed in favor of the insured to further the contract's prime purpose of

indemnification and against the insurer, as the insurer drafts the policy and controls coverage."

*Kvaerner Metals Div. of Kvaerner U.S., Inc., v. Commercial Union Ins*. Co., 908 A.2d 888, 897

(Pa. 2006).  However, "[w]hen the language of the policy is clear and unambiguous, we must

give effect to that language."  *Id*.

 The inquiry begins with an examination of the policy language.  "Words of 'common

usage' in an insurance policy are to be construed in their natural, plain, and ordinary sense, and a

court may inform its understanding of these terms by considering their dictionary definitions."

*Wall Rose Mut. Ins. Co. v. Manross*, 939 A.2d 958, 962 (Pa. Super. Ct. 2007).  The first disputed provision of the policy in this case is the "Commercial Property Conditions" provision, which states that "[w]e cover loss or damage commencing . . . [d]uring the policy period shown in the Declarations."  (Doc. No. 14 at 6).  The essential word in this provision is "commencing," as Plaintiff contends that the second fire commenced within the Policy's coverage period, March 12, 2004 through March 12, 2005.  The verb "commence" means "to have or make a beginning." Merriam-Webster Collegiate Dictionary 230 (10th ed. 2000).  The noun "beginning" means "the point at which something begins," "origin," "source," "a rudimentary stage or early period." *Id*. at 102.  Based upon these straightforward definitions, we conclude that the "Commercial Property Conditions" provision is not ambiguous and may be construed based on the plain meaning of its language.  Specifically, we conclude that in using the word "commence" in this provision, the parties intended that coverage under the Policy would apply to loss or damage that occurs outside of the coverage period so long as that loss had its beginning within the policy period.  *See also Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 545 (6th Cir. 2003) ("To commence is '[t]o initiate by performing the first act or step . . . [or][t]o begin, institute or start.") (*citing* Black's Law Dictionary 268 (6th ed. 1990)).  This construction is consistent with and reinforced by the "Innkeepers Property Coverage" provision.  *See Burton v. Republic Ins. Co.*, 845 A.2d 889, 893 (Pa. Super. Ct. 2004) ("In interpreting the terms of an insurance contract, we examine the contract in its entirety, giving all of the provisions their proper effect."); *Riccio v. Am. Republic Ins. Co.*, 705 A.2d 422, 426 (Pa. 1997) (noting same).  The "Innkeepers Property Coverage" provision states that "[w]e will pay for direct physical loss or damage . . . caused by or resulting from any Covered Cause of Loss."  (*See* Doc. No. 14, Ex. A).  The essential words in

10

the "Innkeepers Property Coverage" provision are (1) "direct physical loss or damage" and (2) "resulting from."

1.      *"Direct Physical Loss"*

The word "direct" in "direct physical loss" means "free from extraneous influence; immediate."  Black's Law Dictionary 471 (7th ed. 1999); *see also* Merriam-Webster Collegiate Dictionary 327 (10th ed. 2000) (defining "direct" as "stemming immediately from a source," "having no compromising or impairing element," and "proceeding from one point to another in time or space without deviation," and "characterized by close logical, causal, or consequential relationship").  A "direct loss" is "[a] loss that results immediately and proximately from an event."  Black's Law Dictionary 957 (7th ed. 1999).  By using "direct" in the "Innkeepers Property" provision, the parties make explicit the common sense inference drawn from the "Commercial Property" provision that coverage for any loss or damage recognized outside the coverage period must have "close logical, causal, or consequential relationship" to an origin within the coverage period.

Courts applying Pennsylvania law have defined "direct physical loss" under an insurance contract as a loss that results "immediately and proximately from an event."  *See Easy Sportswear, Inc., v. Am. Economy Ins. Co.*, No. 05-1183, 2007 WL 4190767, at *6 (W.D. Pa. Nov. 21, 2007) (applying Pennsylvania law).  In *Easy Sportswear*, the plaintiff brought claims against its insurer for breach of an insurance contract and bad faith after the plaintiff's property was damaged by rainfall from Hurricane Ivan.  *Id.* at *2.  Under the policy, the insurer agreed to "pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss."  *Id.* at *5.  Since the policy did not define "direct physical loss,"

the court used the plain and ordinary meaning of the words in order to interpret the provision.

*Id.* at *6 (*citing McMahon v. State Farm Fire & Cas. Co.*, No. 06-3408, 2007 WL 1377670, at

*3 (E.D. Pa. May 8, 2007)).  The court turned to the dictionary meaning of "direct" as "free from

extraneous influence; immediate."  *Id.* (*citing* Black's Law Dictionary (8th ed. 2004) (page

number omitted)).  The court turned to the dictionary meaning of "direct loss" as "[a] loss that

results immediately and proximately from an event."  *Id.* (*citing* Black's Law Dictionary (2d ed.

2001) (page number omitted)).  The court concluded that insurance coverage for a "direct

physical loss" means that the loss must have "close logical, causal, or consequential

relationship" with an earlier event.  *See also DiFabio v. Centaur Ins. Co.*, 531 A.2d 1141, 1143-

44 (Pa. Super. Ct. 1987) (noting that "direct" means "stemming immediately from a source" and

"characterized by close logical, causal or consequential relationship").

2.      *"Resulting from"*

The words "resulting from" also require definition since Plaintiff contends that the Policy

"provides coverage not only for damage *caused by* a fire, but coverage for damage *resulting*

*from* that same covered loss."  (Doc. No. 17 at 10.)  The Supreme Court of Pennsylvania has

interpreted the words "resulting from" in an insurance contract as meaning proximate causation.

*See Bowers v. Great E. Cas. Co.*, 103 A. 536, 537 (Pa. 1918) (interpreting the words "resulting

from" in an insurance policy as implying "a remote or proximate cause"); *see also Donegal Mut.*

*Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007) (finding persuasive the rationale of

courts that look to proximate cause to determine the number of occurrences under an insurance

policy).[3]  Proximate causation is a familiar concept in tort law.  "Proximate cause 'is primarily a

problem of law' and 'it is a . . . court's responsibility to evaluate the alleged facts and refuse to

find an actor's conduct the legal cause of harm when it appears to the court highly extraordinary

that [the actor's conduct] should have brought about the harm.'"  *Brown v. Phila. Coll. of Osteo.*

*Med.*, 760 A.2d 863, 868 (Pa. Super. Ct. 2000) (citations omitted).  "Proximate cause does not

exist where the causal chain of events resulting in [the] plaintiff's injury is so remote as to

appear highly extraordinary that the conduct could have brought about the harm."  *Lux v. Gerald*

*E. Ort Trucking, Inc.*, 887 A.2d 1281, 1286-87 (Pa. Super. Ct. 2005); *see also Pittsburgh Nat'l*

*Bank v. Perr*, 637 A.2d 334, 337 (Pa. Super. Ct. 1994), *appeal denied*, 644 A.2d 1202 (Pa. 1994)

("[T]he law makes a determination that, at some point along the causal chain, liability will be

limited.  The term 'proximate cause,' or 'legal cause' is applied by courts to those considerations

which limit liability, even where the fact of causation can be demonstrated.").

 Courts in other jurisdictions have also considered this "resulting from" contract language

and likewise found proximate causation.  *See, e.g.*, *Pioneer Chlor Alkali Co. v. Nat'l Union Fire*

*Ins. Co.*, 863 F. Supp. 1226, 1233 (D. Nev. 1994) (applying Nevada law) (holding that

"'[r]esulting from' actually confirms use of the efficient proximate cause doctrine [since a] 'loss

---

 [3] In contrast, Pennsylvania courts have interpreted the phrase "arising out of" as connoting a broader notion of "but for" causation.  *See Essex Ins. v. RMJC, Inc.*, No. 01-4049, 2007 WL 3243628, at *3 (E.D. Pa. Nov. 1, 2007) ("Under Pennsylvania jurisprudence, 'arising out of' means causally connected with, not proximately caused by.") (*citing Forum Ins. Co. v. Allied Sec., Inc.*, 866 F.2d 80, 81 (3d Cir. 1989)); *McCabe v. Old Republic Ins. Co.*, 228 A.2d 901, 903 (Pa. 1967) (holding that "'arising out of' means causally connected with, not proximately caused by.  'But for' causation, i.e., a cause and result relationship, is enough to satisfy this provision of the policy"); *Mfr.'s Cas. Ins. Co. v. Goodville Mut. Cas. Co.*, 170 A.2d 571, 573 (Pa. 1961) (construing the words "arising out of" in an automobile insurance policy to mean "causally connected with" and not "proximately caused by").

caused by or resulting from' means a risk which is proximate as distinguished from remote");
*Griffith v. Continental Cas. Co.*, 506 F. Supp. 1332, 1334 (N.D. Tex. 1981) (applying Texas law)
(noting that "caused by or resulting from" language means proximate cause); *Home Ins. Co. v.
Am. Ins. Co.*, 147 A.D.2d 353, 354 (N.Y. App. Div. 1989) (applying New York law) (noting that
phrase "caused by or resulting from" denotes proximate cause); *Westchester Fire Ins. Co. v.
Cont'l Ins. Co.*, 312 A.2d 664, 668-69 (N.J. App. Div. 1973) (applying New Jersey law)
(equating phrases "caused by" and "resulting from" to proximate cause), *aff'd*, 319 A.2d 732
(N.J. 1974).

### 3.    *The Meaning of the Contract Provisions, Taken Together*

The contract provisions at issue here state that Defendant "will pay for direct physical
loss or damage . . . caused by or resulting from any Covered Cause of Loss" provided that the
"loss or damage commenc[es] . . . [d]uring the policy period."  (*See* Doc. No. 14, Ex. A.)
Plaintiff invites us to view the first fire as the "but for" cause of the second fire.  (Doc. No. 17-2
at 9.)  Under Pennsylvania law, "[t]he term 'but for' has been used in analyzing whether or not a
particular act constitutes a cause in fact, rather than the legal or proximate cause of an injury."
*Mahon v. Worker's Comp. App. Bd.*, 835 A.2d 420, 428 (Pa. Commw. Ct. 2003) (*citing Smith v.
Phila. Trans. Co.*, 195 A.2d 168, 170 (Pa. Super. Ct. 1963)).  We are satisfied that proximate
causation – not "but for" causation – is the framework that the parties intended to govern.  We
reach this conclusion based on the plain meaning of the terms in the Policy as evidenced by the
dictionary definitions, the Pennsylvania Supreme Court's interpretation of similar provisions in
*Bowers* and *Baumhammers*, and the reasoning of the district court in *Easy Sportswear* that
applied Pennsylvania law.  Our conclusion is also consistent with the conclusions reached by

courts in other jurisdictions that considered similar policy language. *See, e.g.*, *Pioneer*, 863 F.

Supp. at 1233; *Griffith*, 506 F. Supp. at 1334; *Home Ins. Co.*, 147 A.D.2d at 354; *Westchester*,

312 A.2d at 668-69.  Thus, the Policy does not cover all losses that occur outside the policy

period that would not have occurred "but for" a covered loss, as Plaintiff contends.  Rather, the

Policy covers losses that occur outside of the policy period if the losses are proximately caused

by a covered loss.

  The record in this case does not support a finding that the first fire, a covered harm, was

the proximate cause of the second fire.  The second fire occurred seven months after the first fire.

During this period there were repeated acts of vandalism.  The acts of vandalism in turn

prompted regular police patrols and increased security measures at the main building.  The seven

month span itself was caused by a delayed investigation.  As the Pennsylvania Supreme Court in

*Baumhammers* turned to the single "cause" of the loss to find a single "occurrence" under an

insurance policy, here we turn to the multiple "causes" of the loss – the first fire, multiple

intervening acts of vandalism, a delayed investigation – and find separate "occurrences."[4]  There

is a relationship between the first fire and the second fire based on the events that separate them

in time.  However, the relationship is not one of proximate causation as the Policy requires.

  Plaintiff argues that the "progressive movement (or progressive loss) doctrine" applies to

provide coverage under the Policy for Plaintiff's losses from the second fire.  (Doc. No. 17 at

11.)  Under this doctrine, "damage occurring outside of the policy period [can be] covered . . .

where the condition of the property deteriorates over time."  (Doc. No. 13 at 9.)  For this

---

  [4] Of course, the Policy here does not concern "occurrences," but the status of the fires as distinct occurrences highlights the problem in attributing the loss from the second fire to the first fire seven months earlier.

proposition, Plaintiff relies on *Snapp v. State Farm Fire and Casualty Company*, 206 Cal. App. 2d 827, 831 (Cal. App. 2 Dist. 1962).  Defendant relies on the same case to show that the doctrine does not apply.  In *Snapp*, the plaintiffs built their residence upon a poorly-made "fill." *Id.* at 829.  Due to the potentially unstable fill and heavy rainfall, the land beneath the plaintiffs' residence began to move laterally, causing damage to the foundation of the house.  *Id.*  The damage became progressively worse and the foundation continued to deteriorate after the policy expired.  *Id.*  Although the trial court awarded the plaintiffs damages, the court limited the damages to the losses that the plaintiffs sustained "prior to the expiration date of the policy." *Id.* at 831.  On appeal, the court of appeals reversed the trial court's limitation of damages, holding that "[t]o permit the insurer to terminate its liability while the fortuitous peril which materialized during the term of the policy was still active would . . . allow an injustice to be worked upon the insured by defeating the very substance of the protection for which his premiums were paid." *Id.* The court emphasized that the defendant "could not terminate its liability once the hazard insured against had materialized." *Id.* at 833-34.

Snapp is distinguishable from the instant case.  While the unstable land in *Snapp* materialized during the policy period and continued to cause damage after the policy period had expired, here the second fire did not "materialize" during the policy period.  Faulty wiring caused the first fire.  That fire was extinguished on October 1, 2004.  Seven months later, vandals caused the second fire.  If the first fire had not been fully extinguished on October 1, 2004, and had instead continued to smolder, culminating in the second fire, then *Snapp* might be instructive.  That is not what happened.  The second fire had an independent origin and did not ignite during the policy period.  The fire-damaged main building did not continue to smolder, did

16

not gradually weaken, and did not progressively deteriorate apart from the acts of vandalism.

The "progressive movement" doctrine does not apply.[5]

Summary judgment therefore must be granted in favor of Defendant as to Count One.

**B.     Plaintiff's Bad Faith Claim (Count II)**

Count Two alleges that Defendant's "refusal to compensate [Plaintiff] for its losses

constitutes bad faith toward an insured contrary to the provisions of 42 Pa. C.S.A. § 8371 and

other applicable law."[6]  (Doc. No. 14-4 at 13.)  Plaintiff argues that Count Two alleges bad faith

---

[5] In addition, Defendant correctly points out that the Policy is an "all risk" policy and not an "occurrence" policy.  *See PECO v. Boden*, 64 F.3d 852, 856 (3d Cir. 1995).  In *Boden*, the plaintiff had an "all risk" policy that insured "against all risks of physical losses or damage."  *Id.* at 854.  The court defined an "all risk" policy as one that provides coverage for all losses that take place during the policy period.  "Under an all risks insurance policy, the Underwriters are liable for all losses which [the insured] suffered during the relevant policy periods, regardless of when the occurrence which triggered those losses took place."  *Id.* at 857.  The court contrasted an "all risk" policy with an "occurrence" policy.  *Id.*  An "occurrence" policy "provides coverage for any 'occurrence' which takes place during the policy period."  *Id.*  Under an "occurrence" policy, "it is irrelevant whether the resulting claim is brought . . . during or after the policy period, as long as the injury-causing event happens during the policy period."  *Id.*  Here, the Policy provides coverage for "risks of direct physical loss" similar to the policy in *Boden*.  The Policy is therefore of the "all risk" variety.  Since the Policy insures against "all risks," we cannot conclude that Plaintiff's claim for the second fire is covered under the Policy since the second fire – the injury-causing event – took place outside of the coverage period.

[6] The statute provides as follows:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

17

in Defendant's failure to make timely payment on Plaintiff's initial claim for losses from the October 2004 fire. (Doc. No. 17-2 at 12-14.) Defendant argues that Count Two alleges bad faith in its failure to compensate Plaintiff for its losses from the May 2005 fire. (*See* Doc. No. 18.) Count Two incorporates the preceding paragraphs of the Complaint "as if set forth fully." (*See* Compl. ¶ 25.) The preceding paragraphs of the Complaint make it clear that Count Two could refer to either the first fire or the second fire.[7]

"The nature and scope of § 8371 is still 'unsettled' in Pennsylvania law." *DeWalt v. Oh. Cas. Ins. Co.*, 513 F. Supp. 2d 287, 293 (E.D. Pa. 2007) (*citing Mishoe v. Erie Ins. Co.*, 824 A.2d 1153, 1161 n.11 (Pa. 2003)). The statute does not define "bad faith" or specify what insurer actions give rise to liability, and the Pennsylvania Supreme Court has yet to address the issue. *See id.* The Court of Appeals for the Third Circuit has predicted that the Pennsylvania Supreme Court will follow the two-prong test for liability set out in *Terletsky v. Prudential Property & Cas. Ins. Co.*, 649 A.2d 680, 689-90 (Pa. Super. Ct. 1994). *See Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005) (adopting standard); *see also Jurinko v. Med. Protective Co.*, No. 06-3519, 2008 WL 5378011, at *5 (3d Cir. Dec. 24, 2008) (unpublished opinion) (noting same). Under the two-prong test, the plaintiff must show (1) that the insurer

---

42 Pa. Cons. Stat. Ann. § 8371 (2009).

[7] The function of a complaint "is to give defendants fair notice of plaintiffs' claims and the grounds on which they rest and to show why the plaintiff is entitled to relief." *United States v. City of Phila.*, 644 F.2d 187, 206 (3d Cir. 1980); *see also Hull v. Fleetwood Enter., Inc.*, No. 06-1669, 2007 WL 917088, at *2 (W.D. Pa. Mar. 21, 2007) (*citing Continental Collieries v. Shober*, 130 F.2d 631, 635 (3d. Cir. 1942) (holding same)); *Rueda v. AmeriFirst Bank*, No. 90-3986, 1991 WL 25565, at *3 (E.D. Pa. Feb.25, 1991) (*citing Conley v. Gibson*, 355 U.S. 41, 47 (1957) (noting same)). The Complaint gave Defendant fair notice of claims based on both fires.

lacked a reasonable basis for denying coverage; and (2) that the insurer knew of, or recklessly disregarded, its lack of a reasonable basis. *Terletsky*, 649 A.2d at 689-90.  The plaintiff must establish both elements by "clear and convincing evidence." *Id.*  "In order to survive a dispositive motion as to bad faith, a plaintiff must meet the substantial burden of showing by clear and convincing evidence that said elements are met." *Easy Sportswear*, 2007 WL 4190767, at *12 (*citing Kearns v. Minn. Mut. Life Ins. Co.*, 75 F. Supp. 2d 413, 421 (E.D. Pa. 1999)).  "Accordingly, the plaintiff's burden in opposing a summary judgment motion is commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial." *Id.* at *12 (citation omitted).

> Pennsylvania courts have defined "bad faith" on the part of an insurer as:

> any frivolous or unfounded refusal to pay proceeds of policy; it is not necessary that such refusal be fraudulent.  For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Adamski v. Allstate Ins. Co.*, 738 A.2d 1033, 1036 (Pa. Super. Ct. 1999).  "Bad faith encompasses a wide variety of objectionable conduct." *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 500-01 (Pa. Super. Ct. 2004).  "For example, bad faith exists where 'the insurer did not have a reasonable basis for denying benefits under the policy and . . . the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim.'" *Id.* (*citing O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa. Super. Ct. 1999)); *see also Terletsky,* 649 A.2d at 688 (noting that bad faith is a frivolous or unfounded refusal to pay the proceeds of a policy done with dishonest purpose, motivated by self-interest or ill will).  In *Hollock v. Erie Insurance Exchange*, 842 A.2d 409, 415 (Pa. Super. Ct. 2004) (*en banc*), the Pennsylvania Superior Court

opined that "the broad language of § 8371 was designed to remedy all instances of bad faith conduct by an insurer, whether occurring before, during or after litigation."  Courts have since noted that "[i]mplicit in *Hollock*'s holding . . . is the requirement that the insurer properly investigate claims prior to refusing to pay the proceeds of the policy to its insured."  *Bombar v. W. Am. Ins. Co.*, 932 A.2d 78, 92 (Pa. Super. Ct. 2007) (citation omitted); *see also Condio v. Erie Ins. Exch.*, 899 A.2d 1136 (Pa. Super. Ct. 2006) (holding that bad faith includes lack of good faith in investigating the facts of a complaint).  Thus, bad faith conduct may encompass the insurer's settlement and investigative practices.  *See Birth Ctr. v. St. Paul Cos.*, 787 A.2d 376, 378 (Pa. 2001) (affirming a finding of bad faith where the insurer intransigently refused to settle a claim that could have been settled within policy limits and the insurer lacked a bona fide belief that it had a good possibility of winning at trial); *O'Donnell*, 734 A.2d at 906 ("An action for bad faith may also extend to the insurer's investigative practices.").

Delay in making payment on a claim is "a relevant factor in determining whether bad faith has occurred."  *Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 589 (E.D. Pa. 1999) (applying Pennsylvania law), *aff'd*, 234 F.3d 1265 (3d Cir. 2000).  "[A] long period of time between demand and settlement does not, on its own, necessarily constitute bad faith.  Rather, courts have looked to the degree to which a defendant insurer knew that it had no basis to deny the claimant . . . ."  *Id*. (citations omitted); *see also Quaciari v. Allstate Ins. Co.*, 998 F. Supp. 578, 582-83 (E.D. Pa. 1998), *aff'd*, 172 F.3d 860 (3d Cir. 1998) (granting summary judgment for insurer in part because periods of delay were "equally attributable" to the plaintiff and the defendant, and holding that "even if all delay were attributable to [the defendant], it would not, without more, be sufficient to establish bad faith"); *Aquila v. Nationwide Mut. Ins. Co.*, No. 07-

2696, 2008 WL 5348137, at *9 (E.D. Pa. Dec. 15, 2008) (applying Pennsylvania law) ("It is well-settled . . . that 'a long period of time between demand and settlement does not, on its own, necessarily constitute bad faith"). "[M]ere negligence or bad judgment is not bad faith." *Greene v. United Services Auto. Ass'n*, 936 A.2d 1178, 1188 (Pa. Super. Ct. 2007), *appeal denied*, 598 Pa. 750 (2008).

Evidence of an insurer's delay in settling a claim can support a jury verdict of bad faith when the plaintiff makes multiple demands for payment and the insurer's liability is clear. *See Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 233 (3d Cir. 1997) (applying Pennsylvania law). In *Klinger*, the plaintiffs were injured in a car accident in August 1992 and thereafter filed underinsured motorist claims with the defendant-insurer. *Id.* at 232. The defendant disputed the available policy coverage and submitted the claims to arbitration, which established the available policy coverage. *Id.* In November 1993, the plaintiffs' counsel sent two letters demanding that the defendant tender the policy limits in accordance with the arbitration decision. *Id.* Four months later, the plaintiffs' counsel offered to provide "whatever information [that the defendant] needed to evaluate the extent of damages," but "still [the defendant] did nothing." *Id.* The plaintiffs' counsel again demanded that the defendant tender the policy limits, but the defendant's counsel did not inform the defendant of the demand. *Id.* at 233. In April 1994, the plaintiffs' counsel wrote directly to the defendant and inquired about settlement, but "[s]till [the defendant] offered its insured nothing." *Id.* In June 1994, the defendant made no offer to pay the plaintiffs anything, even though its counsel recommended payment of the policy limits. *Id.* That month, the plaintiffs were awarded damages following a damages arbitration. *Id.* "Finally," in August 1994, "a full two years after the accident, and

[nine] months after [the defendant] had all the information necessary to evaluate [the plaintiffs']
claims, [the defendant] paid them." *Id.* The plaintiffs thereafter filed a lawsuit alleging that the
defendant's "delay in paying their claims was a display of bad faith under 42 Pa. Cons. Stat.
Ann. § 8371." *Id.* A jury found in favor of the plaintiffs and awarded damages. *Id.* On appeal,
the Third Circuit held that "the evidence was sufficient for a jury to conclude that [the defendant]
lacked a reasonable basis for refusing to pay [the plaintiffs], and knew or recklessly disregarded
that fact." *Id.* As evidence of the defendant's bad faith, the Third Circuit observed that the
defendant's "liability was clear" after the plaintiffs submitted a demand package, the defendant
was advised by its attorney to tender the policy limits before a scheduled arbitration, the
defendant "never offered to pay [the plaintiffs] anything beyond [an] early and clearly
inadequate offer," and the "plaintiffs' expert testified that [the defendant] acted recklessly and
unreasonably." *Id.*

An insurer generally does not act in bad faith by delaying an investigation when "red
flags" cause the delay. *See, e.g.*, *Brown v. Liberty Mut. Ins. Group*, No. 99-6596, 2001 WL
87741, at *3 (E.D. Pa. Jan. 30, 2001); *Sanders v. State Farm Ins. Co.*, 47 Pa. D.&C. 4th 129, 139
(Pa. Com. Pl. Ct. 2000), *aff'd*, 777 A.2d 516 (Pa. Super. Ct. 2001). In *Brown*, the plaintiff
alleged that the defendant, her insurer, acted in bad faith in the handling of her claim for car
theft. *Id.* In processing the plaintiff's claim, the defendant conducted a routine examination of
the car and discovered that the ignition had not been disturbed and the steering wheel column
was still locked. *Id.* An uncompromised ignition and a locked steering wheel were "red flags"
that triggered further investigation into theft claims as a precaution against fraud. *Id.* The court
held that an eleven-month delay in paying the plaintiff's claim did not constitute bad faith

because the "red flags" merited additional investigation.  *Id.*  The court observed that the insurance company acted reasonably in delaying the claim while the theft was further investigated.  *Id.*

Similarly, in *Sanders* the plaintiff alleged that the defendant, his insurer, acted in bad faith in the handling of his claim for theft of a Corvette.  *See* 47 Pa. D.&C. 4th at 131.  The plaintiff alleged that the Corvette was stolen from his garage but there was no sign of forced entry into the garage, no sign of forced entry into the vehicle, and no apparent damage to the vehicle.  The court held that a delay of eight months did not constitute bad faith because the plaintiff's claim presented at least ten "red flags" during the investigation, which created a reasonable cause for the delay.  *See id.* at 139.  On appeal, the Superior Court affirmed.  *See* 777 A.2d at 516; *see also Aquila*, 2008 WL 5348137, at *8 (granting summary judgment in favor of the insurer where the delay was caused by multiple "red flags" that prompted an investigation into the plaintiff's claim).

A jury may award punitive damages against an insurer that fails to make payment after ten months and offers no explanation for the delay.  *See Kraeger v. Nationwide Mut. Ins. Co.*, No. 95-7550, 1996 WL 711488, at *3 (E.D. Pa. Dec. 6, 1996) (applying Pennsylvania law).  In *Kraeger*, the plaintiff had an uninsured motorist policy with the defendant, an insurer.  *Id.* at *1.  The plaintiff made a claim under the policy after suffering injuries in a car accident, and the defendant took no action on the plaintiff's claim for over ten months.  *Id.*  The defendant never stated that any portion of the plaintiff's claim was disputed.  *Id.* at *3.  Nevertheless, the defendant "ignored [the plaintiff's] inquiries and failed to offer any amount to [the plaintiff] until a bad faith suit was imminent."  *Id.*  Even then, the defendant "only offered $70,000" when the

defendant's outside counsel valued the claim between $75,000 and $95,000.  *Id.*  The plaintiff

alleged that the defendant acted in bad faith under § 8371.  *Id.*  The court denied the defendant's

motion for partial summary judgment on the issue of punitive damages, holding that a "genuine

issue of material fact exists as to whether [the d]efendant acted with a reckless disregard to [the

plaintiff's] rights."  *Id.*  Thus, the ten-month, unexplained refusal to pay the plaintiff's claim

without evidence of "red flags" was sufficient for the jury to consider punitive damages.

       In this case, there is evidence that Defendant did not attempt in good faith to effectuate a

prompt, fair, and equitable settlement of Plaintiff's claim.  From the beginning, Plaintiff told

Defendant that it intended to rebuild.  Defendant assured Plaintiff that it "would be no problem

to rebuild the property" and within two weeks of the fire sent its contractor, Belfor, to view the

premises.  By January 2005, Plaintiff had provided Defendant with an estimate of the damage.

Defendant's liability was clear at a very early stage.  In the ensuing months, the rebuilding had

not started and vandals began to enter the premises and cause damage.  Plaintiff told Defendant

about the vandalism.  Jones made multiple telephone calls to Defendant demanding payment and

asking what was going on.  Jones inquired with Defendant's former employee about how to "get

this thing done."  Jones asked Defendant to "just give me what you think you owe us."

Nevertheless, Defendant did not make any payment of the insurance proceeds to Plaintiff and did

not provide its estimate of the damage.  Moreover, Belfor did not start reconstruction.  There

were no "red flags" that delayed Plaintiff's claim.  There is no indication that Defendant was

gathering facts for an investigation.  The delay continued.

       It was during this limbo that the second fire destroyed Plaintiff's main building.  Only

after the second fire destroyed what remained of Plaintiff's building did Defendant finally get

around to providing its estimate of the damage from the first fire.  Defendant provided its estimate nine months after the first fire and six months after Plaintiff had submitted its own estimate, even though the contractor that provided Defendant's estimate, Belfor, is the same contractor that had visited the premises at Defendant's request within two weeks of the fire. Belfor's estimate of the damage was approximately $1 million.  The estimate that Plaintiff had provided to Defendant months earlier was only $1,250,745.11.

Considering all of these facts, we are satisfied that a reasonable jury could find by clear and convincing evidence that Defendant acted in bad faith.  Defendant, like the insurer in *Kraeger*, failed to take action over a period of approximately ten months.  *See* 1996 WL 711488, at *3.  Defendant, like the insurer in *Klinger*, waited nine months before providing payment under the policy despite multiple requests from the insured.  *See* 115 F.3d at 233.  In both *Kraeger* and *Klinger*, the court determined that a jury should be permitted to consider an award of punitive damages.  We are satisfied that a jury in this case should be permitted to decide Plaintiff's bad faith claim under § 8371.  Unlike the insurers in *Brown*, *Sanders*, and *Aquila* that offered an explanation for their delay, Defendant has offered no explanation for its inaction and there is no evidence of any "red flags" that might have delayed the investigation.  Summary judgment in favor of Defendant must be denied as to Count Two.[8]

---

[8] If, as Defendant argues, Count Two refers to Defendant's delay in making payment on losses sustained in the second fire, we cannot conclude that Defendant "lacked a reasonable basis for denying coverage" or that it "knew or recklessly disregarded its lack of a reasonable basis." *See Terletsky*, 649 A.2d at 689-90.  As discussed above, Defendant had no obligation to make payment for losses sustained in the second fire.  Thus, Defendant's interpretation of the Policy would not be unreasonable.  Defendant's reading is not the only reasonable reading of Count II, and the Complaint gave Defendant fair notice of claims based on both fires.  Drawing all facts and inferences in Plaintiff's favor, as we must at this juncture, we will not give the Complaint the strained reading that Defendant suggests.  Defendant also argues that the Complaint does not

**V.    CONCLUSION**

For all of these reasons, Defendant's Motion will be granted in part and denied in part.

An appropriate Order follows.

---

allege that its failure to adjust the October 2004 fire claim resulted in consequential damages. (Doc. No. 18 at 2.)  The Federal Rules of Civil Procedure require only that Plaintiff set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  Rule 8 also provides that "[p]leadings must be construed so as to do justice."  Fed. R. Civ. P. 8(e).  While the Complaint does not explicitly state that Defendant's breach of its obligation to adjust the October 2004 claim resulted in consequential damages, the Complaint alleges facts that, read together, placed Defendant on notice of such a claim.  (*See* Compl. ¶¶ 11-19.)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHER-D, INC., T/A PINE KNOB INN       :
                                          :                    CIVIL ACTION
            v.                    :
                                          :                    NO. 05-5936
GREAT AMERICAN ALLIANCE      :
INSURANCE COMPANY            :

**<u>ORDER</u>**

AND NOW, this ___7th___ day of April, 2009, upon consideration of Defendant's Motion

for Summary Judgment (Doc. No. 12), it is ORDERED as follows:

      1.        The Motion is GRANTED as to Count I, and Count I is DISMISSED.

      2.        The Motion is DENIED as to Count II.

IT IS SO ORDERED.


                                BY THE COURT:



                                _____
                                R. Barclay Surrick, J.